1
2
3
4
5
6                     UNITED STATES DISTRICT COURT

7                  FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    UNITED STATES OF AMERICA,              No.  1:13-cr-00218-DAD-BAM

10                  Plaintiff,

11         v.                               ORDER GRANTING DEFENDANT
                                            AGUILAR'S MOTION TO DISMISS
12   JOSE GONZALEZ-MARTINEZ, et al.,
                                            (Doc. No. 233)
13                  Defendants.

14

15         This matter is before the court on defendant Miguel Angel Aguilar Chavez's motion to

16   dismiss the indictment filed on April 25, 2022.  (Doc. No. 233.)  Hearings on the motion were

17   held on May 16, 2022, June 28, 2022, and July 15, 2022.[1]  (Doc. Nos. 239, 247, 252.)  At those

18   hearings Assistant United States Attorney Karen Escobar appeared via Zoom on behalf of the

19   United States of America, and attorney Nicholas Reyes appeared on behalf of defendant Miguel

20   Angel Aguilar Chavez ("defendant Aguilar").  (Doc. Nos. 239, 247, 252.)  For the reasons

21   explained below, the court will grant defendant Aguilar's motion to dismiss the indictment.

---

[1]  At the evidentiary hearings on the pending motion, the court heard testimony from the
following government witnesses:  Immigration and Customs Enforcement ("ICE") Supervisory
Detention and Deportation Officer Brandon Boyd; Retired Drug Enforcement Administration
("DEA") Special Agent William Sicord; DEA Group Supervisor Jay Anderson; Supervisory
Deputy United States Marshal Timothy Merrell; Federal Bureau of Investigation ("FBI") Identity
History Operations Manager Charles Smith; Department of Motor Vehicles Investigator Michael
Ortega; and Denver Police Detective Rick Romero.  (See Doc. Nos. 247, 252.)  Defendant did not
call any witnesses.  In addition, the court admitted the following exhibits into evidence:
Government Exhibits A-1, A-2, A-3, A-4, A-5, A-6, A-9, B, C, C-1, C-2, C-3, C-4, C-6, C-7, C-8
D-1, D-2, D-3, D4, D-5, E (Bates-stamped page 28129 only), E-1, F-1.  (Doc. Nos. 247; 250 at
123, 128; 252.)

1

**BACKGROUND**[2]

2        In June 2012, the DEA conducted a wiretap investigation targeting a number of

3 individuals who the DEA suspected to be engaged in the distribution of heroin and

4 methamphetamine in the Stanislaus County area. (Doc. No. 235 at 5.) According to the DEA, on

5 June 6, 2012, DEA agents saw defendant Aguilar interact with one of the targets of the DEA's

6 investigation in a parking lot, after which time the two drove separately to a house on Ironside

7 Drive ("Ironside") in Modesto, which house defendant Aguilar appeared to enter using a garage

8 door remote. (*Id.* at 6.) A short time later, defendant Aguilar departed Ironside with a passenger,

9 drove to a Home Depot store, and appeared to begin driving back to the Ironside residence. (*Id.*)

10 While on that drive, a Ceres police officer was directed to and did conduct a traffic stop on

11 defendant Aguilar's vehicle. (*Id.*) During the traffic stop, defendant Aguilar, whose full name is

12 Miguel Angel Aguilar Chavez,[3] presented the officer with an identification card in the name of

13 Marcelo C. Aguilar bearing a photo resembling defendant and a birth date in October 1977. (*Id.*)

14 (*Id.*) When questioned, defendant Aguilar provided the officer with an address on Brandon

15 Avenue in Modesto as his own and informed the officer that he had been arrested "a long time

16 ago attempting to bring $10,000 in U.S. currency into the United States from Mexico."[4] (*Id.* at

---

17
18 [2] The following facts are derived from defendant Aguilar's pending motion to dismiss, the government's opposition to the pending motion, and the evidentiary hearings held in connection with the pending motion.

19
20 [3] In its briefing on the pending motion, the government requested that the court make a new true name finding in this case that would displace Magistrate Judge Barbara A. McAuliffe's January 13, 2020 finding that defendant Aguilar's true name is Miguel Angel Aguilar. (Doc. Nos. 186; 249 at 18.) While Judge McAuliffe's finding was not technically incorrect, *see* fn. 11, *infra*, it did not include defendant Aguilar's maternal surname, which is Chavez. (*See* Doc. No. 250 at 21, 23–24.) Accordingly, at the July 15, 2022 evidentiary hearing on the pending motion, the undersigned did make a true name finding that defendant's true and full name is Miguel Angel Aguilar Chavez and that true name finding is re-affirmed here. (Doc. No. 252; 254 at 108.)

21
22
23
24 [4] In its supplemental briefing in opposition to defendant Aguilar's pending motion to dismiss, the government states that it is "unclear whether Aguilar indicated he resided at an address on Brandon [Avenue], which does not exist, or whether he indicated he lived at an address on Braden [Avenue]," which does exist, noting that the law enforcement officer may have misheard defendant Aguilar. (Doc. No. 263 at 10 n.4.) Nonetheless, as described below, addresses on both Brandon Avenue and Braden Avenue were associated with defendant Aguilar in June 2012. (*See* Doc. No. 249 at 11.)

25
26
27
28

6–7.)  The officer then checked with the El Paso Intelligence Center and learned that Marcelo Aguilar had been arrested in 1998 for attempting to bring $40,000 in U.S. currency into the United States from Mexico.  (*Id.*)  When questioned, the passenger in defendant Aguilar's vehicle identified herself as Silvia Farias Gonzalez and stated she was defendant Aguilar's wife.  (*Id.* at 6, 9.)  At the conclusion of the traffic stop, according to the government, defendant Aguilar was released "to avoid compromising the wire."  (*Id.* at 7.)

Later that day, law enforcement officers executed a search warrant at the Ironside residence, suspecting it of being a stash house associated with the drug trafficking organization under investigation.  (*Id.*)  Therein, officers found heroin, methamphetamine, and firearms.  (*Id.*)  The officers also found the following identification documents:  (1) a fraudulent California driver's license bearing defendant Aguilar's photograph in the name of Jose Luis Aguilar with an address on Braden Avenue in Modesto and a birth date in November 1975; (2) a social security card in the name of Jose Luis Aguilar; (3) a valid California driver's license bearing defendant Aguilar's photograph in the name of Miguel Aguilar Chavez with an address on Maui Drive in San Jose and a birth date in November 1975; and (4) a check written out to Miguel Angel Aguilar.  (*Id.*)  In documenting the results of that search, a local law enforcement officer identified the driver's license for Jose Luis Aguilar as being fraudulent and the driver's license for Miguel Aguilar Chavez as being valid.  (Doc. No. 250 at 84–85.)

Thereafter, law enforcement continued their investigation of their lead targets, including by initiating five additional wiretaps on other individuals and coordinating with another DEA office in California.  (Doc. No. 235 at 7.)  These efforts culminated in three separate indictments being returned in which ten different defendants were named.  (Doc. No. 235 at 5.)

On May 23, 2013, nearly one year after the search at the Ironside residence, an indictment was filed under seal charging defendant Aguilar and seven other individuals with conspiring to distribute heroin and methamphetamine and possessing with intent to distribute heroin and methamphetamine.  (*See* Doc. No. 1.)  On the indictment and the subsequently issued arrest warrant, defendant Aguilar's name was listed as "MARCELO AGUILLAR, aka JOSE LUIS AGUILAR."  (*Id.*; Doc. No. 8.)  According to the government, the indictments "were not

3

1    presented earlier in order to avoid comprising the ongoing investigation and to organize and

2    finalize the evidence for discovery." (Doc. No. 235 at 8.) The indictment charging defendant

3    Aguilar remained sealed until August 15, 2013. (Doc. No. 12.)

4           On September 5, 2013, the DEA transferred the search for defendant Aguilar to the United

5    States Marshals Service ("USMS") by preparing and delivering to the USMS a Personal History

6    Report, DEA Form 202 ("Form 202") as to defendant Aguilar. (Doc. No. 235 at 8, 21–22.) The

7    form includes several pieces of information to aid the USMS in their search for the individual,

8    including: a subject name of Marcelo Aguilar; a date of birth in November 1975 (the same date

9    present on both driver's licenses found at the Ironside residence); an alias name of Jose Luis

10   Aguilar; an "alternate date of birth" in October 1979[5]; an FBI number; a social security number;

11   an address on Braden Ave in Modesto (the address listed on the fraudulent driver's license in the

12   name of Jose Luis Aguilar); a driver's license number taken from the fraudulent driver's license

13   in the name of Jose Luis Aguilar; a spouse name of Silvia Gonzalez Farias; and a spouse address

14   on Brandon Avenue in Modesto (which defendant Aguilar allegedly gave to law enforcement

15   during the traffic stop on June 6, 2012). (*Id.* at 21.) The second page of the Form 202 contained

16   a "Remarks" section which additionally listed: an address at the Ironside residence; an

17   "additional alias" of Miguel Aguilar Chavez; and the driver's license number taken from the valid

18   driver's license in the name of Miguel Aguilar Chavez. (*Id.* at 22.) Next to a question asking

19   whether defendant Aguilar was a "priority target," the box was marked "no." (*Id.* at 21.) The

20   USMS in Fresno received the Form 202 on September 24, 2013. (*Id.* at 8, 21–22.)

21          On September 30, 2013, the USMS uploaded the arrest warrant for defendant Aguilar into

22   the National Crime Information Center ("NCIC") database, which allows nearly any law

23   enforcement agency in the country to learn that an individual is wanted by checking their

24   /////

25

26   _____

     [5] As noted above, the government alleges that the identification card defendant Aguilar presented
     to law enforcement during the June 6, 2012 traffic stop bore an October *1977* birthdate. (*See,*

27   *e.g.*, Doc. Nos. 235 at 6; 263 at 10.) Thus, it is unclear why the Form 202 listed an October *1979*
     birthdate, and the government has not provided any further explanation for the DEA's inclusion

28   of this alternative date.

information against the database.[6]  (Doc. No. 235 at 9.)  Shortly thereafter, on October 9, 2013, law enforcement received a report from an examination of latent fingerprints found on the drugs seized at the Ironside residence.  (*See* Gov't. Exh. A-5.)  The DEA fingerprint examiner tasked with analyzing the latent fingerprints determined that at least one of the fingerprints was associated with Miguel Chavez Aguilar, whose FBI number matched the FBI number appearing on the Form 202.  (*Id.*)

Over the course of the following six years, law enforcement efforts to apprehend defendant Aguilar all but came to a halt, apart from, at most, annual NCIC database checks conducted by the DEA and USMS to ensure that the warrant was still active.  (Doc. No. 250 at 77, 110–11; *see also* Doc. No. 254 at 66–67.)  Beyond these annual database checks, the government admits that it did not make any other efforts to apprehend defendant Aguilar or investigate other leads that might lead to his arrest.  (Doc. No. 250 at 92.)  USMS files indicate that as of October 1, 2018, it had in its possession Department of Motor Vehicles ("DMV") photos and records of Miguel Aguilar Chavez that were taken on December 26, 2017 and listing an address on El Sereno Court in Modesto; however, it appears that no further investigative action was taken at that time.  (*See* Doc. No. 235 at 9; Gov't. Exh. C-4.)

/////

---

[6]  It is unclear whether the name and information associated with "Miguel Aguilar Chavez" was entered into the NCIC database, or whether the only names entered into that database were Marcelo Aguillar and Jose Luis Aguilar, the names listed on the arrest warrant.  At the June 28, 2022 evidentiary hearing on the pending motion, former DEA Special Agent Sicord testified that DEA agents "entered all the aliases" associated with defendant Aguilar onto the Form 202 "in the hopes that if he were stopped by . . . law enforcement . . . that one of those identifiers would have triggered a match to our warrant at NCIC."  (Doc No. 250 at 80.)  Similarly, Supervisory Deputy U.S. Marshal Timothy Merrell testified that "any known aliases" are entered into NCIC as a matter of course.  (*Id.* at 134.)  However, the government represents only that the USMS uploaded the *arrest warrant* into the NCIC database on September 30, 2013.  (Doc. No. 235 at 9.)  Likewise, at the July 15, 2022 evidentiary hearing on the pending motion, Supervisory Deputy Merrell testified that the USMS entered *the arrest warrant* for defendant Aguilar into NCIC.  (Doc. No. 254 at 60–61.)  As noted above, the arrest warrant issued in connection with the indictment in this case did not include defendant Aguilar's actual name as it was listed on his valid driver's license, Miguel Aguilar Chavez, which was listed on the Form 202.  (Doc. No. 8.)  The court also notes that although the DEA Form 202 lists the name "Marcelo Aguilar," the indictment and arrest warrant in this case spelled that name "Marcelo Aguillar."  (Doc. Nos. 1, 8.)

1    On October 2, 2019, a Deputy U.S. Marshal conducted an "active case audit" and

2  obtained a point of contact from the DEA.  (Gov't. Exh. C-5 at 1.)  Around this time, a new

3  Deputy U.S. Marshal, Supervisory Deputy Merrell, was assigned to defendant Aguilar's file.

4  (*See* Doc. No. 254 at 63–66.)  On October 9, 2019, Supervisory Deputy Merrell requested

5  additional photographs of defendant Aguilar from the DEA.  (Doc. No. 235 at 9.)  A report from

6  the USMS at that time stated

7
> [t]he USMS was provided information from the DEA case agent
8 > regarding AGUILAR.  Case agent provided photos and an updated
> name for AGUILAR, stating that he was now living under the first
9 > name Miguel.  AGUILAR kept the same social security number and
> date of birth.  Recent photographs, and driver's license under the
10 > name Miguel confirmed the individual to be the same wanted
> individual charged in indictment 1:13-cr-00218 as AGUILAR,
> Marcelo AKA Jose Luis Aguilar.
11

12  (Gov't. Exh. C-6 at 1.)

13    Just a few weeks later, on October 31, 2019, law enforcement performed "static

14  surveillance" on a residence at Moonlight Drive in Ceres, California in connection with defendant

15  Aguilar's warrant.  (*Id.*)  That same day, the USMS arrested defendant Aguilar after seeing an

16  individual who matched the photographs in the USMS files exiting a truck at the Moonlight Drive

17  residence.  (Doc. No. 235 at 10.)  USMS records indicate that while defendant Aguilar was being

18  transported to the Fresno County Jail, defendant Aguilar "spontaneously . . . stated that he was

19  very surprised that he was being arrested on a case from so long ago in his past" and that he had

20  "assumed that . . . he got away with the crimes."  (*Id.*; Gov't. Exh. C-6 at 2.)  Upon arrival at the

21  Fresno County Superior Jail, Supervisory Deputy U.S. Marshal Merrell booked defendant Aguilar

22  under the name appearing on the arrest warrant, Marcelo Aguilar.  (Doc. No. 235 at 10.)

23  Defendant Aguilar then stated that he had used his brother's name in the past, but that his brother

24  was "legit and clean [and] never did anything bad," and that although defendant Aguilar "had

25  been trying to work and do the right thing now," his past had "finally" caught up to him.  (*Id.*;

26  Gov't. Exh. C-7 at 1.)

27    At a detention hearing for defendant on November 7, 2019, defense counsel advised the

28  court that defendant's true name was Miguel Angel Aguilar.  (Doc. No. 184.)  On January 13,

6

1   2020, the court made a true name finding as to the name Miguel Angel Aguilar.  (Doc. No. 186.)

2   Since that finding was made, defendant Aguilar has stipulated to several continuances in this case

3   and agreed to the exclusion of time under the Speedy Trial Act through December 14, 2022, the

4   date on which a status conference is set in this case.  (*See, e.g.*, Doc. Nos. 196, 202, 205, 211,

5   222, 225, 228, 229, 258, 260.)

6          On April 25, 2022, defendant Aguilar filed the pending motion to dismiss the indictment

7   against him, alleging that the delay between his indictment and his arrest violated his Sixth

8   Amendment right to a speedy trial.[7]  (Doc. No. 233.)  On April 29, 2022, the government filed its

9   opposition to the pending motion.  (Doc. No. 235.)  On May 12, 2022, defendant Aguilar filed his

10  reply.  (Doc. No. 236.)  On June 28, 2022, defendant Aguilar filed supplemental briefing in

11  support of his motion to dismiss.  (Doc. No. 245.)  On June 28, 2022 and July 8, 2022, the

12  government filed supplemental briefing in support of its opposition to defendant Aguilar's motion

13  to dismiss.  (Doc. Nos. 246, 249.)  On August 15, 2022, following the conclusion of the June 28,

14  2022 and July 15, 2022 evidentiary hearings, defendant Aguilar filed further supplemental

15  briefing in support of his motion.  (Doc. No. 257.)  The government filed its supplemental

16  opposition thereto on September 14, 2022.[8]  (Doc. No. 263.)

17  /////

18  /////

19

20  [7]  Defendant Aguilar does not challenge the pre-indictment delay in this case.  (*See* Doc. No. 233
    at 4.)  Moreover, defendant Aguilar brings this motion only on constitutional grounds; in other

21  words, he does not move to dismiss the indictment pursuant to the Speedy Trial Act, 18 U.S.C.
    § 3161 *et seq.*  In addition to challenging the post-indictment delay on Sixth Amendment grounds,

22  defendant Aguilar also states that he is challenging the delay on Fifth Amendment due process
    grounds.  (*Id.* at 9.)  Because defendant Aguilar has provided no authority connecting the delay in

23  this case to his Fifth Amendment rights and the court finds that the challenged delay violated
    defendant Aguilar's Sixth Amendment rights for the reasons explained below, the court need not

24  address any potential Fifth Amendment due process arguments in this order.

25

26  [8]  In its September 14, 2022 supplemental opposition, the government requests that the court
    strike Government Exhibit E and instead admit into evidence only Government Exhibit E-2, the

27  page of Government Exhibit E that is Bates-stamped 28129.  Because, as noted above, the court
    only admitted the page of Government Exhibit E that is Bates-stamped 28129, the government's

28  request to strike the remainder of Government Exhibit E is denied as moot.

7

1       **LEGAL STANDARD**

2           "The Sixth Amendment guarantees that, in all criminal prosecutions, the accused shall

3   enjoy the right to a speedy trial." *Doggett v. United States*, 505 U.S. 647, 651 (1992).  "The

4   government has the primary, though not exclusive, responsibility to ensure that the defendant is

5   brought to trial."  *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008).  In determining

6   whether a delay between the time of indictment and arrest violates a defendant's Sixth

7   Amendment right to a speedy trial, courts balance four factors set forth by the Supreme Court in

8   *Barker v. Wingo*, 407 U.S. 513 (1972):  (1) the length of the delay; (2) the reason for the delay

9   (i.e., whether the defendant or the government is more to blame for that delay); (3) whether the

10  defendant asserted her right to a speedy trial; and (4) whether the defendant suffered prejudice as

11  a result of the delay.  *Doggett*, 505 U.S. at 651 (citing *Barker*, 407 U.S. at 530).  "None of these

12  four factors are either necessary or sufficient, individually, to support a finding that a defendant's

13  speed[y] trial right has been violated."  *Mendoza*, 530 F.3d at 762.  Instead, these factors "must be

14  considered together with such other circumstances as may be relevant."  *Barker*, 407 U.S. at 533.

15      **ANALYSIS**

16          Defendant asserts that the 77-month delay in between the indictment and his arrest was

17  unreasonably long, that the government is to blame for the delay, that he timely asserted his

18  speedy trial rights under the constitution, and that prejudice may be presumed here because "the

19  delay is great and attributable to the government."  (Doc. No. 233 at 8) (citing *United States v.

20  Shell*, 974 F.2d 1035, 1036 (9th Cir. 1992)).  In opposition, the government contends that

21  defendant Aguilar was primarily at fault for the delay in his apprehension and the balance of the

22  *Barker* factors weigh in the government's favor.

23          1.      Length of the Delay

24          The length of the delay is "both a substantive factor in the speedy trial analysis and 'a

25  triggering mechanism.'"  *United States v. Hernandez*, — F. Supp. 3d —, No. 2:02-cr-00788-CJC,

26  2020 WL 2464800, at *4 (C.D. Cal. May 12, 2020) (quoting *Barker*, 407 U.S. at 530–31).  For

27  speedy trial claims, "delay is measured from 'the time of the indictment to the time of trial.'"

28  *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003) (quoting *United States v. Sears,*

1     *Roebuck & Co.*, 877 F.2d 734, 739 (9th Cir. 1989)).  "If the length of the delay is long enough to

2     be considered presumptively prejudicial, an inquiry into the other three factors is triggered."

3     *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).  "Although there is no bright-line

4     rule, courts generally have found that delays approaching one year are presumptively prejudicial."

5     *Gregory*, 322 F.3d at 1161–62.

6        The parties do not dispute that "[t]he 77-month delay here is presumptively prejudicial

7     and is sufficient to trigger an inquiry into the remaining *Barker* factors."  (Doc. No. 235 at 13; *see*

8     *also* Doc. No. 233 at 5–6.)  Accordingly, the court will proceed to the consideration of the

9     remaining *Barker* factors.  *See, e.g.*, *United States v. Aguirre*, 994 F.2d 1454, 1457 (9th Cir.

10     1993) (finding that "a five year delay [between indictment and arrest] is long enough to trigger a

11     further look" under *Barker*); *United States v. Barragan*, No. 5:99-cr-20143-BLF, 2015 WL

12     35455832, at *2 (N.D. Cal. June 5, 2015) (a 54-month delay between arraignment and intensive

13     government investigation was presumptively prejudicial and warranted consideration of the

14     *Barker* factors).

15        2.     <u>Reason for the Delay</u>

16        The second *Barker* factor looks to whether the defendant or the government is more to

17     blame for the delay at issue.  *Doggett*, 505 U.S. at 651.  "[T]he prosecution bears the burden of

18     explaining pretrial delays."  *McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003).  In addition,

19     whether a defendant must show actual prejudice under the fourth factor of the *Barker* test turns on

20     the court's finding as to the second *Barker* factor.  *United States v. Aguirre*, 994 F.2d at 1456.

21     For this reason, the second *Barker* factor is the "flag all litigants seek to capture."  *United States*

22     *v. Loud Hawk*, 474 U.S. 302, 315 (1986).

23        "The government has some obligation to pursue a defendant and bring him to

24     trial."  *Mendoza*, 530 F.3d at 762–63 (internal quotation marks omitted).  "If the government

25     fulfills that obligation by pursuing a defendant with reasonable diligence," the defendant must

26     show actual prejudice under the fourth *Barker* factor.  *Id.*; *Aguirre*, 994 F.2d at 1456.

27        On the other hand, "[w]here the government is negligent in pursuing a defendant,

28     prejudice [under the fourth *Barker* factor] will be presumed and its weight in defendant's favor

1    will depend on the length of the delay." *Aguirre*, 994 F.2d at 1456.  The government need not

2    make "heroic attempts" to apprehend a defendant who is purposefully avoiding detection, but "if

3    the defendant is not attempting to avoid detection and the government makes no serious effort to

4    find him, the government is considered negligent in its pursuit."[9]  *Mendoza*, 530 F.3d at 763.

5          Defendant argues that the government is solely to blame for the delay between his

6    indictment and arrest.  (Doc. No. 233 at 3–4, 8.)  He avers that during the entire six-and-a-half-

7    year period in between his indictment and arrest, he "resided in Modesto, California and has

8    always resided" in the Modesto area.  (*Id.* at 3.)  In addition, he asserts that he

9
10           maintained an upright and open lifestyle, working and annually filing his federal taxes, obtaining his Class "A" drivers [sic] license, testing with federal agencies for the Department of Transportation, purchased a home, obtained utility services for his residence, had almost weekly or daily contact with law enforcement at all weight-scale truck inspections as a Class "A" driver, and remained in the Modesto area with his wife and children.
11
12

13    (*Id.* at 11.)  As a result, defendant argues that the government was "extremely negligent in

14    pursuing him" and "did not do its duty to timely exercise due diligence in arresting a known,

15    identified person with a federal warrant."  (*Id.* at 8.)

16          The government counters that defendant Aguilar is primarily at fault for the lengthy delay

17    in his apprehension.  (Doc. No. 235 at 13.)  Although the government concedes that it could have

18    made "other efforts" to locate defendant, (*see* Doc. No. 250 at 7), it argues that defendant Aguilar

19    "caused the majority of the delay by evading law enforcement authorities," specifically by

20
21           (1) providing a false name (Marcelo Aguilar) in 2012 to the Ceres police officer and DEA agent when he was stopped following the transportation of drugs to the [Ironside] stash house (2) utilizing a vehicle registered to another individual with a different address; (3) using two different names with two different birth dates in identification documents, as found at the stash house; (4) using a false name when he previously attempted to smuggle a large quantity
22
23

24    _____

25    [9]  "By employing the terms 'negligent' or 'negligence' in the context of this analysis, the court

26    does not understand the caselaw to require a defendant to show professional negligence by the government in the sense of showing that law enforcement's efforts fell below the established standard of police practice in the community."  *United States v. Vasquez*, 15 F. Supp. 3d 1000,

27    1003 (E.D. Cal. 2014).  Rather, the use of these terms in the context of the speedy trial analysis focuses on whether the government proceeded with "reasonable diligence" and made a "serious

28    effort" to find a defendant.  *Doggett*, 505 U.S. at 656; *Mendoza*, 530 F.3d at 763.

of cash into the United States; (5) not having further contact with the police after his involvement in this case; and (6) continuing to utilize a false name up to the time of his arrest in 2019.

(*Id.* at 13–14.)  The government states that law enforcement "did not know Aguilar's true name or address" until after his arrest and thus "could not have run a simple credit check to locate him." (*Id.* at 15.)  Thus, the government argues that even if it "made mistakes" in the search for defendant Aguilar, consideration of this factor nonetheless weighs against him due to his own efforts to actively evade arrest.  (*Id.*)

In reply, defendant Aguilar contends that as of the date of the search of the Ironside residence, "the DEA agents and assisting agencies had in its possession a *true* and *valid* California drivers [sic] license of defendant" bearing his real name, accurate date of birth, and valid driver's license number.  (Doc. No. 236 at 1–2) (emphasis in original).  He adds that he has "maintained an active credit history" with various banking institutions, he has never fled the jurisdiction or avoided police contact, law enforcement never attempted to contact his brother (Marcelo Aguilar), he had no knowledge that there was a warrant issued for his arrest in May 2013, and all of his known addresses were within a five-mile radius of each other.[10]  (*Id.* at 2.; Doc. No. 237 at 1.)  As such, it is his position that the government evinced a "total lack of any effort to execute the arrest warrant" during the delay.  (Doc. No. 236 at 2.)

       a.    *Delay Attributable to the Government*

It is evident that the government made minimal efforts, if any, to apprehend defendant in the six years following his indictment.  From the evidence presented to the court, it is apparent that law enforcement had in its possession defendant's driver's license and had in fact identified that driver's license as being valid in June 2012.  (*See* Doc. No. 250 at 84–85.)  In addition, the Form 202 transmitted to the USMS in September 2013 listed defendant's valid driver's license

/////

/////

---

[10]  Defendant provides no explanation for the San Jose address listed on his valid driver's license seized at the Ironside residence, which obviously lies outside of the five-mile radius described above.  (*See* Gov't. Exh. A-4.)

1   number, true social security number, and his wife's name.[11]  (*See* Gov't. Exh. A-1.)  Although

2   defendant certainly contributed to the confusion surrounding which of the three names—Marcelo

3   Aguilar, Jose Luis Aguilar, or Miguel Aguilar Chavez—was his true name, the latent fingerprint

4   examination report dated October 9, 2013 lists the name "Miguel Chavez Aguilar," along with an

5   FBI number that matched the FBI number listed on the Form 202 and corresponds to the

6   government criminal history records for Miguel Angel Aguilar-Chavez.  (*See* Gov't. Exhs. A-1,

7   A-5, A-6.)  Given this information, fewer than seven months after the indictment, law

8   enforcement had various leads it could have investigated to determine defendant Aguilar's true

9   identity and address, such as further investigation to corroborate the likelihood that defendant's

10  true name was Miguel Aguilar Chavez (which was listed on the valid driver's license seized at

11  Ironside but was not included on the indictment or arrest warrant issued in this case), surveilling

12  or researching the various addresses associated with defendant Aguilar, contacting any of his

13  known friends or family members, or running a credit check using defendant Aguilar's social

14  security number.  Despite its belief that defendant Aguilar resided at Ironside due to his apparent

15  entry into the residence by use of a garage-door opener shortly before the execution of the search

16  warrant on June 6, 2012 and the "indicia" found there bearing his name, photographs, and

17  fingerprints, the government did not follow up on its initial search at the Ironside address by

18  "making a second visit or surveilling the area."  (*See* Doc. No. 250 at 80–81); *Hernandez*, 2020

19  WL 2464800, at *5.  Nor does it appear that law enforcement ever attempted to contact Marcelo

20  Aguilar or research Jose Luis Aguilar, whose names appeared on the indictment in this case.

21

22  [11]  In its opposition to defendant Aguilar's motion to dismiss, the government states that it

23  believes Maria Soccorro Chavez Aguilar to be defendant Aguilar's wife, rather than Silvia Farias Gonzalez, who indicated that she was defendant Aguilar's wife at the time of the June 6, 2012

24  traffic stop, because Maria Soccorro Chavez Aguilar's name is on the title of defendant Aguilar's El Sereno Court address.  (Doc. Nos. 235 at 6; 250 at 136.)  However, the evidence before the

25  court at most suggests that she may be a relative of defendant Aguilar.  Defendant Aguilar maintains that Silvia Farias Gonzalez is his wife, the booking sheet from defendant's arrest lists

26  his wife's name as "Silvia Aguilar," and defendant Aguilar's tax returns list Silvia Farias Gonzalez as his spouse.  (Doc. No. 236 at 2; Gov't. Exhs. C-8 at 1; D-1.)  In its supplemental

27  briefing on the pending motion, the government refers to Silvia Farias Gonzalez as defendant Aguilar's wife and appears to no longer suggests that Maria Soccorro Chavez Aguilar is

28  defendant Aguilar's wife.  (Doc. No. 249 at 9.)

There is also no indication from the evidence before the court that law enforcement ever attempted to contact or locate Silvia Farias Gonzalez, who was present with defendant Aguilar at the time of the June 6, 2012 traffic stop and identified herself as defendant Aguilar's wife. (*See* Doc. Nos. 235 at 6, 9.)  In short, "[b]ased on the evidence in the record, the DEA [and USMS] made no attempt" to use the information available to them to apprehend defendant Aguilar. *Hernandez*, 2020 WL 2464800, at *5 (finding that government did not act with reasonable diligence where it "failed to follow-up on obvious leads that could have led them to the defendant").

Instead, the government's efforts after the indictment "consisted almost entirely of intermittent and selective database searches." *Id.*  At the evidentiary hearing in connection with defendant's motion, former DEA Special Agent Sicord testified that after turning the matter over to the USMS, it would have been standard operating procedure for the DEA to conduct an annual NCIC search to ensure the arrest warrant for defendant Aguilar was still active.  (Doc. No. 250 at 77.)  Supervisory Deputy Merrell also testified that it was standard operating procedure for a Deputy Marshal to conduct a similar annual NCIC database review for individuals designated as fugitives.  As described by Supervisory Deputy Merrell, this review entails multiple components:

> [T]he deputy would look into NCIC and make sure that everything is correct in NCIC.  They would contact the other agencies that provided us the warrant to see if any new information has developed.  They would also attempt to make efforts to uncover any other information that wasn't previously uncovered to help and assist in apprehension[] of the suspect . . . . It's a requirement. . . . [annually] at a minimum, or when any information is developed . . . they should go in and, you know, conduct some sort of update or . . . at least research the new information that they received and see if it's valid or not.

(Doc. No. 250 at 110–11.)  The government has not submitted evidence documenting any annual USMS database reviews of defendant Aguilar's arrest warrant—or any research conducted by law enforcement following the "new information" contained in the October 2013 fingerprint report—until Supervisory Deputy Merrell became involved in October 2019, less than one month before

/////

/////

1    defendant Aguilar was apprehended.[12]  (*See* Gov't. Exh. C-5 at 1.)  Even assuming these annual

2    database searches were timely performed, however, it is well-settled that reliance on database

3    checks alone is insufficient to satisfy the government's obligation to pursue a defendant with

4    reasonable diligence.  *See, e.g.*, *Mendoza*, 530 F.3d at 763 ("[I]n this case, the record is silent as

5    to any efforts by the government to apprehend [defendant] beyond merely entering [his] arrest

6    warrant in the law enforcement database, and the evidence before the district court is insufficient

7    to support a finding that the government conducted a serious effort to find [defendant]");

8    *Hernandez*, 2020 WL 2464800, at *5–6 (noting that "intermittent and selective database searches

9    . . . . [do not] satisfy a reasonable diligence standard" and finding that "[i]f a defendant has not

10   fled the country, relying solely on online searches and the entry of an arrest warrant into

11   government databases is not considered 'diligent'"); *United States v. Fernandes*, 618 F. Supp. 2d

12   6, 80 (D.D.C. 2009) ("Entering a criminal defendant's name into a database is a routine matter

13   and does not satisfy the government's diligence obligation."); *United States v. Vasquez*, 15 F.

14   Supp. 3d 1000, 1005 (E.D. Cal. 2014) ("The Ninth Circuit has held that such a passive

15   investigation relying only on entry of the arrest warrant in a government database is not

16   diligent."); *United States v. Eguez*, No. 2:09-cr-92-FTM-CM, 2016 WL 6493456, at *8 (M.D.

17   Fla. Nov. 2, 2016) ("The government took the most minimal steps possible in this case—it placed

---

18   [12]  At the July 15, 2022 evidentiary hearing, Supervisory Deputy Merrell testified that he did not
19   see anything in the USMS records indicating that the government took any steps to attempt to
     locate defendant Aguilar during this time period, apart from one database check shortly before
20   defendant Aguilar's arrest; nonetheless, it was possible that the USMS has engaged in some
     investigative activities, but declined to document those efforts due to them being unsuccessful.
21   (Doc. No. 254 at 66–67.)  Similarly, Assistant United States Attorney Escobar stated at that
     hearing that the USMS *may* have taken steps toward apprehending defendant Aguilar between
22   October 2013 and October 2019, but that the government "just [doesn't] have the record of it."
     (*Id.* at 104.)  Following that hearing, the government submitted USMS Activity Logs
23   documenting USMS database activity in connection with defendant Aguilar's arrest warrant.
     (Gov't. Exh. C-9.)  According to the government's supplemental briefing, these logs demonstrate
24   that the NCIC intermittently sent "validation notices" to the USMS, causing the USMS to
     "validate[] the warrant" on January 5, 2016, December 22, 2016, and December 21, 2017.  (Doc.
25   No. 263 at 19.)  The government has not provided any further explanation for what this validation
     process entailed or whether it encompassed the substantive, research-based tasks included in
26   Supervisory Deputy Merrell's above description of an annual database review.  As a result, on the
     evidence before it, the court is unable to conclude that the USMS even conducted annual database
27   checks in connection with defendant Aguilar's arrest warrant.

28

1   defendant in the NCIC computer system and waited.  The Sixth Amendment required much more

2   in this case.").

3          The government advances the unremarkable argument that the above-described other

4   efforts to apprehend defendant would have been futile, and accordingly, the government was not

5   required to pursue the leads in their possession in order to satisfy its due diligence.  (Doc. Nos.

6   246 at 2; 250 at 141.)  However, the cases the government cites in support of this proposition are

7   inapplicable to this case.  For example, in *United States v. Corona-Verbera*, which is cited by the

8   government, the Ninth Circuit held that "where our government has a good faith belief supported

9   by substantial evidence that seeking extradition from a foreign country would be futile, due

10  diligence does not require our government to do so."  509 F.3d 1105, 1114 (9th Cir. 2007).  The

11  court sees no reason to extend this holding beyond the international extradition context, and the

12  government has cited no authority applying *Corona-Verbera* outside of that narrow and unique

13  context.  *See, e.g.*, *United States v. Dardoon*, No. 2:99-cr-00270-CAS, 2013 WL 40883629 (C.D.

14  Cal. Aug. 12, 2013) (citing *Corona-Verbera* only within the context of seeking extradition from a

15  foreign country); *Eguez*, 2016 WL 6493456 at *7 (same); *Fernandes*, 618 F. Supp. 2d at 69

16  (same); *United States v. Heshelman*, 521 Fed. App'x. 501, 507 (6th Cir. 2013) (same)[13]; *see also*

17  *United States v. Frederick*, 789 Fed. App'x. 123, 129 (11th Cir. 2019) (describing a case in which

18  the Eleventh Circuit held that "the government was not required to attempt 'futile legal gestures'"

19  to extradite the defendant from India to the United States) (quoting *United States v. Bagga*, 782

20  F.2d 1541 (11th Cir. 1986))[14]; *United States v. Smith*, 277 F.3d 405, 415 (W.D.N.Y. 2016)

21  (analyzing the potential futility of government efforts to seek extradition of a defendant from a

22  foreign country).  The cases cited by the government are plainly inapplicable to the circumstances

23  /////

24  /////

25

26  [13]  Citation to this unpublished Sixth Circuit opinion is appropriate pursuant to Sixth Circuit Rule 32.1(a).

27

28  [14]  Citation to this unpublished Eleventh Circuit opinion is appropriate pursuant to Eleventh Circuit Rule 36-2.

1    of this case, where all evidence before the court suggests that defendant Aguilar resided in

2    California during the entirety of the period between his indictment and arrest.[15]

3         Moreover, the court is unpersuaded that efforts to apprehend defendant Aguilar apart from

4    the annual NCIC database checks would have been futile.  For example, given defendant

5    Aguilar's representations of his multiple contacts with law enforcement between the period of his

6    indictment and arrest, it is certainly plausible that law enforcement may have apprehended

7    defendant Aguilar sooner if the DEA or USMS had added his name as it appeared on his seized

8    valid driver's license—Miguel Aguilar Chavez—to the NCIC database.  (*See* Doc. No. 233 at 4.)

9    Similarly, the evidence before the court suggests that defendant Aguilar lived openly under his

10   true name in the Modesto area during the period between his indictment and arrest, and the

11   government has not demonstrated that efforts to determine defendant Aguilar's place of residence

12   would have been futile or would have in any way required "heroic efforts."  *See Hernandez*, 2020

13   WL 464800, at *6 ("The government's investigation revealed two different residential addresses

14   associated with [defendant].  At the very least, basic due diligence required the government to

15   make some attempt to locate him at both addresses.  Because the two residences were only a few

16   miles apart, such an investigation would not have required heroic efforts.") (internal citation and

17   quotation omitted).  The government's assertion that such efforts would have been unsuccessful

18   here is further undercut by the aforementioned evidence before the court suggesting that the

19   USMS only began its search in earnest for defendant Aguilar upon a staffing change in October

20   /////

---

21   [15]  At the July 15, 2022 evidentiary hearing on defendant's pending motion, the undersigned
22   informed the parties that the government cited several extradition cases in its opposition to
     defendant Aguilar's motion to dismiss the indictment, but that those cases were inapplicable to
23   the circumstances of this case.  (*See* Doc. No. 254 at 43.)  In the government's supplemental
     briefing filed after that hearing, the government explicitly notes that certain cases it cites therein
24   took place outside of the extradition context.  (*See, e.g.*, Doc. No. 263 at 33, 37.)  However, it
     appears that the government has misunderstood the nuances of the court's point in this regard:
25   the government argues that it is not required to take certain measures to apprehend a defendant if
     those measures would have been futile (*see, e.g.*, Doc. No. 246 at 2), but the government has
26   failed to cite any cases outside of the international extradition context in support of this specific
     proposition.  The court recognizes that, apart from this specific argument, the government has
27   cited a wide range of non-extradition cases in its over-90 pages of briefing submitted on the
     pending motion.
28

1    2019 that brought Supervisory Deputy Merrell to the case and resulted in the successful arrest of

2    defendant less than one month later.  (*See* Gov't. Exh. C-6; Doc. No. 254 at 63–64.)

3            As noted above, the government also asserts that law enforcement assumed defendant

4    Aguilar lived at the Ironside residence, but nonetheless did not return to that residence to attempt

5    to execute the warrant for his arrest.  (*See* Doc. No. 250 at 92.)  The government similarly argues

6    that defendant Aguilar is in part to blame for the delay in this case because of the many different

7    potential addresses associated with him, which constitute "conflicting identifying information":

8    (1) a Sunnyvale address used by defendant Aguilar in his immigration A-file documents in 1997;

9    (2) a San Jose address used by defendant Aguilar in his immigration A-file documents in 2001;

10   (3) a Brandon Avenue address in Modesto that defendant Aguilar provided to the officer who

11   conducted the traffic stop on June 6, 2012; (4) a Braden Avenue address in Modesto on the false

12   driver's license for Jose Luis Aguilar that was seized at the Ironside residence on June 6, 2012;

13   (5) a San Jose address on the valid driver's license for Miguel Aguilar Chavez that was seized at

14   the Ironside residence on June 6, 2012 and was in defendant Aguilar's DMV records as of

15   September 5, 2012; (6) an El Sereno Court address in Modesto that was used in connection with

16   defendant Aguilar's filed 2012–2014 and 2016–2017 tax returns, 2012 Chase banking statements,

17   2019 American Express banking statements, and 2013 and 2017 DMV records; (7) a Waterloo

18   Court address in Modesto used in connection with defendant Aguilar's filed 2015 tax returns; (8)

19   a Carlos Court address in Modesto that defendant Aguilar reported to the United States

20   Citizenship and Immigration Services in early October 2019, and (9) a Moonlight Drive address

21   in Ceres where defendant Aguilar was arrested and had utility bills in his name.  (Doc. No. 249 at

22   11–12, 14; *see also* Doc. No. 263 at 29–30.)

23           The court notes that the first two addresses were used long before the time of defendant's

24   indictment in May 2013, and in any event, ICE Supervisory Detention and Deportation Officer

25   Boyd testified at the June 28, 2022 evidentiary hearing that the DEA did not have access to

26   defendant Aguilar's immigration A-file documents.  (Doc. No. 250 at 23.)  Thus, these two

27   addresses could not have contributed to the DEA's and USMS's delay in this case.  As to the

28   remaining addresses, the government does not proffer any evidence establishing that any of these

1    addresses, apart from Brandon Avenue address in Modesto (which does not exist), were false.

2    Indeed, based upon the evidence before the court, it appears that many, if not all, of these

3    addresses were valid residences for defendant Aguilar between 2012 and 2019 and that defendant

4    Aguilar may have maintained multiple or changing residences at different points during this

5    period of time.  Likewise, there has been no showing here that any of these addresses—apart from

6    the Brandon Avenue address—were utilized with the intent to evade law enforcement.  (*See*

7    Testimony of Supervisory Deputy Merrell, Doc. No. 250 at 132 ("[U]sually people that are

8    fugitives from the law, do not file taxes.").)  Instead, the government suggests that defendant

9    Aguilar's transient lifestyle reduced its burden to expend "serious effort" to find him.  *Mendoza*,

10   530 F.3d at 763. (*See* Doc. No. 249 at 14) (describing how defendant Aguilar contributed to the

11   delay in this case in part because "the record indicates that he used multiple addresses from [2012

12   to 2019] . . . . The defendant was not the owner of any of the properties, where he claimed to have

13   resided, except on a tax return for the calendar year 2015 for the Waterloo address.").  However,

14   as the Third Circuit has explained,

15           As for justifying the government's inaction based on [defendant's]
16           "transient" life, we have serious doubts that this characterization is
             helpful in the reasonable diligence inquiry.  To be sure, the
17           government can only pursue reasonably available leads, and the
             absence of a paper trail for defendant might leave the government
18           with fewer avenues for investigation.  Our focus is not the type of
             life a suspect leads, however, but whether the government has
19           diligently used the information available to it.  Describing a
             defendant as "transient" . . . . carries the risk that the label will be
20           used as a substitute for a detailed factual assessment of the
             government's investigation, diluting the "serious effort" that *Doggett*
21           requires of law enforcement authorities.  Moreover, this risk would
             likely be felt disproportionately by those in more limited economic
22           circumstances, unfairly lessening the Sixth Amendment speedy-trial
             protection for those who are not so fortunate as to be well-rooted in
23           society.

24   *United States v. Velazquez*, 749 F.3d 161, 179–80 (3d Cir. 2014) (internal citation omitted).

25   Accordingly, absent a showing by the government that defendant Aguilar used these addresses in

26   an attempt to evade arrest, the mere fact that defendant Aguilar maintained several addresses

27   during the period between the indictment and his arrest does not weigh against him in the court's

28   analysis under the second *Barker* factor.

                                                    18

Based on the evidence before it, the court finds that "[t]he government was not reasonably diligent in its efforts to apprehend" defendant Aguilar.  *Hernandez*, 2020 WL 2464800, at *5; *see also United States v. Beamon*, 992 F.2d 1009, 1013 (9th Cir. 1993) (affirming a district court's finding that the government "did not act with appropriate diligence" in pursuing a defendant, even though law enforcement efforts during seventeen-month delay included "several nights" of driving by and watching defendant's house, knocking on defendant's door, and leaving a message with defendant's wife); *Velazquez*, 749 F.3d at 180–81 (finding that the government was not reasonably diligent in pursuing a defendant where law enforcement checked the NCIC database eight times in five years and placed defendant on a "Most Wanted" list at the DEA office, but declined to investigate a number of addresses associated with defendant, did not attempt to reach defendant through mail or known contacts, and did not attempt to interview defendant's family members).*United States v. Avila*, No. 2:05-cr-0102-LDG-GWF, 2007 WL 3396417, at *11 (D. Nev. Nov. 8, 2007) ("[T]he Government has an obligation to exercise due diligence to find and apprehend indicted persons.  It is not due diligence to simply wait until an accused 'pops-up' into government view and then arrest him."); *Dardoon*, 2013 WL 4083629, at *3 ("The government is negligent in ignoring, willfully or otherwise, a defendant who is living openly under his given identity for a number of years—even abroad.").

### b.   *Delay Attributable to Defendant*

Having found that the government was not reasonably diligent in its search for defendant Aguilar, the court next considers whether defendant Aguilar is nonetheless more to blame for the delay in this case due to his use of multiple aliases.

As described above, the evidence before the court confirms that defendant Aguilar used two aliases in June 2012. [16]  First, during the traffic stop on June 6, 2012, defendant Aguilar told a

---

[16]  The government contends that the following names appearing on various of defendant Aguilar's documents represent "conflicting identifying information" and suggests that these names constitute aliases:  Miguel Aguilar Chavez; Miguel A. Aguilar Chavez; Miguel Angel Aguilar; Miguel A. Aguilar; Miguel Aguilar; Miguel Chavez; and Miguel Angel Chavez Aguilar.  (*See* Doc. No. 249 at 12.)  As noted above, defendant's full name is Miguel Angel Aguilar Chavez.  At the June 28, 2022 evidentiary hearing on this matter, the parties established that Aguilar is defendant's paternal last name, while Chavez is defendant's maternal last name.  (*See*

1    law enforcement officer that his name was Marcelo Aguilar, that he lived on Brandon Avenue in

2    Modesto, and presented the officer with an identification card in the name of Marcelo C. Aguilar

3    with a date of birth in October 1977.  (Doc. No. 235 at 6–7.)  He also told the officer that he had

4    been arrested "a long time ago" while attempting to bring $10,000 into the U.S. from Mexico.

5    (*Id.*)  Marcelo Aguilar is in fact defendant Aguilar's brother, the "Brandon Avenue" address does

6    not exist, defendant Aguilar's birth date is in November 1975, and defendant Aguilar failed to

7    disclose his true and complete arrest history during the traffic stop.  (*See* Doc. Nos. 235 at 10; 250

8    at 117; Gov't. Exh. A-6 at 2–3.)

9           Second, during their execution of a search warrant, law enforcement found a fraudulent

10   California driver's license in the name of Jose Luis Aguilar at the Ironside residence on the

11   evening of June 6, 2012.  (Doc. No. 235 at 9–10.)  This driver's license contained defendant

12   Aguilar's photograph, true birth date, and an address on Braden Avenue in Modesto.  (*See* Gov't.

13   _____

14   Doc. No. 250 at 23–24.)  Also at that hearing, ICE Supervisory Detention and Deportation Officer
     Brandon Boyd testified that on many occasions, the maternal and paternal surname of Hispanic

15   individuals may be flipped or omitted on certain official documents.  (*Id.* at 21.)  Supervisory
     Deputy Merrell testified that the inversion or omission of maternal and paternal surnames can

16   pose difficulties in the apprehension of a fugitive "if [law enforcement] can't confirm [which]
     name is true or correct."  (*Id.* at 127.)  However, the government has made no showing that

17   defendant Aguilar signed his name with or without his middle name or one of his surnames in an
     attempt to avoid arrest.  Thus, while potential confusion caused by various permutations of

18   defendant Aguilar's true name may bear on the reasonableness of the government's efforts to
     identify and locate defendant Aguilar, the different permutations of the defendant's true name

19   appearing in documents such as his utility bills and bank statements—some of which may have
     been computer-generated and are not necessarily due to defendant Aguilar's specific inputting of

20   information—cannot reasonably be considered aliases or weighed against him.  *See Velazquez*,
     749 F.3d at 168 n.4 ("The report states that Velazquez was also known as Sergio Velazquez-

21   Payan and Sergio Payan.  These are permutations of his surname from his father (Velazquez) and
     from his mother (Payan). . . . They are, in fact, a common result of using Spanish surnames in the

22   United States.") (internal citation omitted); *Hernandez*, 2020 WL 2464800, at *7 n.8 ("The
     government argues that Mr. Lopez was using a 'false name' at the time of his arrest:  'Fernando

23   Ezequiel Lopez Rodriguez.'  However, Mr. Lopez has shown that this is his full legal name.  The
     fact that Mr. Lopez used both of his surnames in some contexts but not others does not show

24   evasive conduct.") (internal citations omitted); *United States v. Schloer*, No. 2:01-cr-00360-RHW,
     2008 WL 4949037, at *3 (C.D. Cal. Nov. 14, 2008) ("The Government contends that Defendant

25   spelled his name Schloer (inserting an e after the o) while in Europe. . . The alternate spelling is
     explained by the lack of an umlaut in word processors. . . . The different spelling of the name was

26   not done by the Defendant with the intent to avoid arrest, but was the result of the nuances of the
     German language.").

27

28

1    Exhs. A-4 at 2; A-6.)  As noted previously, a contemporaneous law enforcement report

2    documenting the results of the search at the Ironside residence identified this driver's license for

3    Jose Luis Aguilar as being fraudulent.  (Doc. No. 250 at 117.)

4         The government argues that "even if law enforcement made mistakes in their search" for

5    defendant Aguilar, his "use of false information about his identity was the primary cause of the

6    delay in his apprehension."  (Doc. No. 235 at 16.)  Although the government cites ample

7    authority to support its assertion, the cases it cites are invariably distinguishable from the instant

8    case.  In many of these cases relied upon by the government, courts found—unlike here—that the

9    government made reasonable efforts to apprehend the defendant, but that the defendant's evasive

10   tactics rendered these reasonable efforts unsuccessful.  *See United States v. Hernandez*, 821 Fed.

11   App'x. 776, 777–78 (9th Cir. 2020) (holding that the government satisfied its obligation to pursue

12   defendant with "reasonable diligence" when it "attempted to arrest [defendant] at his last-known

13   address [and] circulated [defendant's] photograph at nearby businesses" in addition to monitoring

14   a federal law enforcement database;[17] *United States v. Sperow*, 494 F. 3d 1223, 1226 (9th Cir.

15   2007) (affirming the district court's finding that defendant's right to a speedy trial was not

16   violated where "the government was reasonably diligent in attempting to locate him" by

17   conducting "periodic credit and criminal history checks" over a nine-year period, sending leads to

18   out-of-state agents who were attempting to locate defendant, and informing defendant's brother

19   that defendant was wanted); *United States v. Lazzara*, 709 Fed. App'x. 578, 581 (11th Cir. 2017)

20   (finding that "while the Government may have been able to do more," the government "took

21   reasonable and diligent steps to locate [defendant]," including investigating the two aliases used

22   by the defendant to evade law enforcement in connection with a different case); *United States v.

23   James*, 183 Fed. App'x. 923, 927 (11th Cir. 2006) (affirming the district court's finding that

24   speedy trial rights were not violated where, although "the government could have done more to

25   apprehend [defendant]," law enforcement made several visits to the home of defendant's

26   companion in an attempt to locate him and "continued to question those known to have a

27

28   ────────────────

[17]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

relationship" with defendant over the years)[18]; *United States v. Gibson*, No. 8:00-cr-00442-JDW-AEP, 2016 WL 845272, at *2–3 (M.D. Fla. Mar. 4, 2013) (explaining that the government "unsuccessfully attempted to locate" defendant at a potential address and investigated an individual suspected to be defendant, despite the government's leads consisting of "nothing more" than two fictitious names and a photograph of defendant); *United States v. Aleman*, No. 1:08-cr-00223-WSD, 2017 WL 816174, at *7 (N.D. Ga. Mar. 2, 2017) (finding that law enforcement efforts were "reasonable and undertaken in good faith" where those efforts included conducting surveillance on defendant's suspected addresses and questioning defendant's relatives); *Dardoon*, 2013 WL 4083629, at *4 (noting that "the government did not act negligently in pursuing defendant and bringing him to trial" where the government sought the assistance of the Israeli government in locating defendant, but defendant was "living in the West Bank, under the control of Palestinian Authority, with whom the United States does not have an extradition treaty"); *United States v. Cruz*, 681 Fed. App'x. 819, 831, 823 (11th Cir. 2017) (finding that consideration of the second *Barker* factor weighed against defendant where "the government had acted with reasonable diligence in its attempt to locate" him, defendant was culpable in causing delay by providing false identifying information to law enforcement, and the government did not possess identifying information about defendant, such as his "birthday, Social Security number, or FBI number")[19]; *United States v. Cruz*, 8:07-cr-00387-CEH, 2015 WL 5389256, at *3–4 (M.D. Fla. Sept. 14, 2015), *aff'd*, 681 Fed. App'x. 819 (11th Cir. 2017) (describing the government's efforts toward apprehending defendant, which included investigating potential leads relating to the false identity defendant provided to law enforcement and attempting to learn of the defendant's whereabouts from his family members, despite the government not having an accurate "date of birth, social security number, FBI number, fingerprints, or other identifying information" for the defendant); *United States v. Walker*, 92 F.3d

---

[18]  Citation to these unpublished Eleventh Circuit opinions is appropriate pursuant to Eleventh Circuit Rule 36-2.

[19]  Citation to this unpublished Eleventh Circuit opinion is appropriate pursuant to Eleventh Circuit Rule 36-2.

22

714, 717–18 (8th Cir. 1996) (concluding that the district court did not err in finding that the government exercised reasonable diligence in pursing the defendant where FBI offices in multiple states made efforts to locate the defendant based on information obtained from his co-conspirators, the FBI checked NCIC database every six months, and FBI agents provided defendant's fingerprints to FBI headquarters); *United States v. Green*, 223 Fed. App'x. 408, 410 (5th Cir. 2007) (affirming the district court's finding that only a "relatively short" period of the delay was due to the government's negligence" and noting the government's efforts to locate defendant)[20]; *United States v. Villarreal*, 613 F.3d 1344, 1352–53 (11th Cir. 2010) (noting that the government efforts included surveilling multiple properties connected to defendant "immediately after the grand jury issued an indictment," following leads "to their end" each time they arose, and monitoring the NCIC and Auto Track databases).  Thus, the cases cited by the government in this regard are unpersuasive as to this case because they involved government efforts that, even if imperfect, materially and clearly exceeded the efforts made by the government to apprehend defendant Aguilar in this case.

In other cases cited by the government, the defendants actively evaded arrest by fleeing the jurisdiction and/or assuming and living under an alias *after* the underlying events that led to an arrest warrant being issued.  *See Hernandez*, 821 Fed. App'x. at 777 (finding that defendant "avoided apprehension by living under an alias in a remote part of Colorado"); *Sperow*, 494 F. 3d at 1226 (finding that defendant "deliberately concealed his whereabouts"); *United States v. Spero*, No. 1:96-cr-00058, 2005 WL 906485, at *2–3 (D. Or. Apr. 15, 2005) (defendant presented a driver's license with his true name when questioned by law enforcement during the event giving rise to the indictment, but thereafter fled the state and assumed an alias until his arrest eight years later), *aff'd in part and vacated on other grounds*, *Sperow*, 494 F.3d 1223 (9th Cir. 2007); *James*, 183 Fed. App'x. at 927–28 (defendant moved out-of-state and "consistently used" aliases up until his arrest); *United States v. Knop*, No. 1:88-cr-20015-DML, 2003 WL 22327826, at *8 (E.D. Mich. Oct. 6, 2003) (the defendant was more to blame for the delay where he actively evaded

---

[20]  Citation to this unpublished Fifth Circuit opinion is appropriate pursuant to Fifth Circuit Rule 28.7.

arrest using "lifestyle change[s] . . . plainly designed to avoid detection," including adopting an

alias, abandoning his dental practice, abstaining from having a driver's license or holding

property in his name, abstaining from registering vehicles, quit-claiming his home to another

individual, living for a period of time in an unheated cabin during the Michigan fall season, and

refusing to pursue any activities that would generate certain IRS forms); *Walker*, 92 F.3d at 718

(defendant fled the state after being released on bond and assumed an alias in an "active" attempt

to disguise his identity); *Wilson v. Mitchell*, 250 F.3d 388, 395 (6th Cir. 2001) (the defendant was

more responsible for delay where the defendant "vigorously evaded apprehension and discovery

by the police for 22 years" by repeatedly changing his identity, name, physical appearance, and

whereabouts" in order to evade law enforcement); *United States v. Valiente-Mejia*, No. 1:04-cr-

772-NRB, 2009 WL 3401210, at *8 (S.D.N.Y. Oct. 19, 2009) ("Defendant concedes that he

concealed his true identity upon reentry to the United States.  He fraudulently obtained a New

York State driver's license, using the alias Antonio Z. Mejia and his mother Carlo's Address, and,

*for the duration of the post-indictment delay*, was using this false identity to avoid apprehension

by law enforcement") (emphasis added) (internal citation omitted).

    Here, the government has proffered no evidence suggesting that defendant Aguilar lived

under either of his aliases after the indictment was returned in an attempt to evade arrest.[21]  The

court agrees with the government that defendant Aguilar's use of an alias during the June 6, 2012

---

[21]  The government avers that defendant Aguilar provided the name "Marcelo Aguilar" to law enforcement during the June 6, 2012 traffic stop in order to "evade arrest" on an outstanding arrest warrant from 2003 in Denver, Colorado.  (Doc. No. 263 at 26, 34.)  The government's sole basis for this assertion appears to be its speculation that had defendant Aguilar disclosed his true name during the traffic stop, "he could have been arrested on that warrant following a criminal history check."  (*Id.* at 25–26.)  However, the issue of whether defendant Aguilar sought to avoid apprehension in Denver is completely irrelevant to the question before the court, namely, whether defendant Aguilar is more to blame for the delay *in this case* due to his use of aliases.  Moreover, even assuming the court found evidence of a 2003 Denver arrest warrant relevant to the resolution of the pending motion, the government's argument in this regard is belied by the fact that, as further explained below, the evidence before this court suggests that defendant Aguilar lived openly in the Modesto area and interacted with law enforcement under his true name during the period between his indictment and his arrest.  (*See* Doc. No. 233 at 11; Gov't. Exhs. D–1–D–5); *cf. Aleman*, 2017 WL 816174, at *6 (noting that the defendant in that case "elected to abandon his family, including his children, to avoid apprehension" in connection with a state prosecution).

1   traffic stop certainly hampered law enforcement's ability to efficiently search for him during their

2   investigation.  However, the court finds it appropriate to draw a distinction in the speedy trial

3   analysis between circumstances where, as here, a defendant seeks to evade detection by law

4   enforcement in connection with potentially criminal conduct he is engaged in at the time, and the

5   circumstances of the many cases cited by the government, where a defendant is put on notice that

6   he is wanted by the government and subsequently adopts an alias and/or flees the jurisdiction to

7   evade arrest.  One is meant to avoid law enforcement detection generally, while the other is

8   specifically intended to avoid or delay prosecution.  Here, the evidence before the court suggests

9   that upon finally learning about the indictment, defendant accepted the fact of his prosecution,

10   and his former use of an alias was not motivated by a desire to delay his trial.[22]

11       Accordingly, none of the cases cited by the government in this regard address the

12   circumstances of this case, where a defendant uses aliases to avoid detection *prior to* an

13   indictment being returned but subsequently lives openly under his true name in the same

14   jurisdiction only a short distance from where he initially interacted with law enforcement, and law

15   enforcement fails to pursue the defendant with any reasonable diligence following the return of

16   his indictment.

17       In sum, defendant Aguilar initially provided law enforcement with a false name and

18   address during a traffic stop.  Later that day, the government executed a search warrant at a

19   residence, where it learned of two additional names associated with the defendant.  Nevertheless,

20   the government soon after possessed defendant Aguilar's true name, date of birth, FBI number,

---

21   [22]  According to Supervisory Deputy Merrell, who processed and booked defendant Aguilar

22   following his arrest, when the booking officer called for defendant Aguilar to approach the
     booking counter, defendant Aguilar asked Supervisory Deputy Merrell for clarification as to what

23   name was called.  (Gov't. Exh. C-7 at 1.)  Supervisory Deputy Merrell informed him that the
     name called was Marcelo Aguilar, and defendant Aguilar clarified that his name was Miguel

24   Aguilar and that Marcelo was his brother.  (*Id.*)  Supervisory Deputy Merrell told defendant
     Aguilar that he did not want to arrest the wrong person and asked if he had ever used his brother's

25   name.  (*Id.*)  Defendant Aguilar "stated that he had used it and that his brother is legit and clean,
     never did anything bad, and this was about him, . . . and that his past had caught up to him." (*Id.*)

26   That defendant Aguilar did not attempt to use the confusion surrounding his name at booking as
     an opportunity to flee or evade arrest further suggests that the circumstances of this case are

27   distinguishable from the cases cited by the government in which defendants adopted aliases to

28   avoid and delay prosecution.

1   social security number, driver's license number, and various addresses associated with defendant

2   during the six-and-a-half-year period between his indictment and arrest.  It also possessed two

3   aliases, one false date of birth, at least one false address, as well as a fingerprint analysis and valid

4   driver's license that strongly indicated which name was defendant Aguilar's true name.  In other

5   words, the government possessed more than enough information to realize that the suspect they

6   were indicting went by the name of Miguel Aguilar Chavez.[23]  It does not appear, however, that

7   the government did anything with this information, apart from entering some of it into the NCIC

8   database and checking that database at least once.  Meanwhile, defendant Aguilar lived openly

9   under his true name, filed taxes, repeatedly came into contact with law enforcement, renewed his

10  driver's license with an updated address, and provided updated documentation to the United

11  States Citizenship and Immigration Services.[24]  (*See* Doc. Nos. 249 at 8, 12; Gov't. Exhs. D-1–D-

12  5.)

13      The government possessed enough information to, without making "heroic efforts," know

14  defendant Aguilar's true name nearly one year *before* he was indicted, yet the government has not

---

[23]  Indeed, the government admits in its supplemental briefing in opposition to the pending motion that on September 30, 2012, "the Sacramento USMS entered the defendant's correct FBI number, social security number, and date of birth, as well as his place of birth . . . and his DEA NADDIS [Narcotics and Dangerous Drugs Information System] number."  (Doc. No. 263 at 19; *see also id.* at 14.)  In addition, at the July 15, 2022 evidentiary hearing on the pending motion, government witness Charles Smith, an identity history operation manager for the FBI's Criminal Justice Information Services Division, noted that the government's Record of Arrests and Prosecution sheet for defendant Aguilar listed a February 20, 2007 arrest of defendant Aguilar in which he provided law enforcement with the name of "Marcelo Aguilar."  (*See* Doc. No. 254 at 14–16; Gov't. Exh. A-9 at 11.)  Accordingly, the evidence before the court shows that the government possessed ample information to not only know defendant Aguilar's true identity, but also to know that he had used the alias Marcelo Aguilar in the past.

[24]  In its supplemental briefing the government asserts that "[r]ecords of the California Department of Tax and Fee Administration contradict Aguilar's claim that he was a law-abiding taxpayer."  (Doc. No. 263 at 30.)  In support of this contention, the government cites an unpaid 1999 California state tax deficiency assessed in connection with defendant Aguilar's alleged attempt to open an automobile "body shop" in 1998.  (*Id.*; Gov't. Exh. G at 2, 4.)  The court does not find this information relevant to the resolution of the pending motion, and the government does not argue that this unpaid tax balance calls into question the authenticity of the state and federal tax return records the government successfully moved to admit into evidence at the evidentiary hearing.  (*See* Gov't. Exh. D-1; Doc. No. 250 at 123, 127–28.)  Accordingly, the court declines to further address the allegedly unpaid state tax balance in this order.

explained to the court why it chose to indict defendant Aguilar under the name he gave during the traffic stop (Marcelo Aguilar) and an "aka" name found on a known-to-be-fraudulent driver's license (Jose Luis Aguilar), but chose not to include the name found on the confirmed to be valid driver's license (Miguel Aguilar Chavez) acquired by law enforcement on the very same day. Furthermore, even assuming that the government believed Marcelo Aguilar to be defendant Aguilar's true name, there has been no showing whatsoever that the government ever took any steps to identify or locate Marcelo Aguilar in the six-and-a-half years following the return of the indictment in this case. Under these facts, the government's argument that defendant Aguilar's alias made finding him futile is belied by the fact that the government seemingly could have arrested his brother Marcelo, a real person living in the state of California, but never did. (*See* Gov't. Exh. C-7). Simply put, the government "failed to follow-up on obvious leads that could have led them to the defendant," regardless of defendant Aguilar's use of aliases prior to the issuance of the indictment in this case. *Hernandez*, 2020 WL 2464800, at *6.

Therefore, although defendant Aguilar's use of an alias makes the consideration of this factor a somewhat close question, the court concludes that the government's lack of any serious effort to apprehend defendant Aguilar is the primary reason for the challenged delay that has occurred in this case. *See United States v. Hernandez*, 821 Fed. App'x. at 777–78 (9th Cir. 2020) ("Regardless of whether [a defendant] took steps to avoid apprehension, the second factor favors dismissal only if the Government failed to pursue [the defendant] with 'reasonable diligence.'"); *United States v. Avila*, No. 2:05-cr-0102-LDG-GWF, 2007 WL 3396417, at *11 (D. Nev. Nov. 8, 2007) ("While Defendant's use of alias names arguably made it more difficult for the Government to promptly identify and locate him, it does not excuse the Government's failure to find Defendant in federal custody for more than two years."); *Barragan*, 2015 WL 3548532, at *3 (finding that the government was negligent in its investigation and more to blame for the delay despite defendant's knowledge that his relatives were arrested in connection with the conspiracy defendant allegedly participated in, because the government, "[h]aving turned up no useful information through its annual database checks, . . . neglected to broaden the investigation to include contact with known family members, DMV checks, and state public benefits records,

27

which would have led to finding [defendant] promptly"); *Hernandez*, 2020 WL 2464800, at *7 (finding that the government's argument that defendant changed addresses in order to evade arrest "carries little weight given that the government failed to act on information that would have led them directly to the [new] address. . . . [and] it would not have required heroic efforts to use this information.") (internal quotation omitted); *Schlor*, 2008 WL 4949037, at *3 (finding that defendant's use of a false name did not prevent the government from locating defendant because the government knew of the false name and nickname defendant used); *United States v. Love*, 125 F.3d 856 (Table), 1997 WL 618831, at *3 (6th Cir. Oct. 6, 1997) (finding that the second *Barker* factor weighs in favor of the defendant where the government was negligent in locating and arresting defendant, despite defendant's use of eight aliases); *cf. United States v. Molina-Garcia*, No. 2:20-cr-00288-CMR, 2022 WL 2116828, at *6–8 (E.D. Pa. June 13, 2022) (finding that second *Barker* factor weighs against the defendant where defendant skipped bail, used an alias between his indictment and arrest, and law enforcement efforts were "extensive and time-consuming"); *United States v. Sandoval*, 990 F.2d 481, 485 (9th Cir. 1993) (the district court was not clearly erroneous in holding that the government satisfied its obligation to pursue the defendant because law enforcement "received information . . . that [defendant] was incarcerated in Mexico, and that he had no intention of returning to the United States," law enforcement "periodically inquired as to [defendant's] whereabouts with Mexican authorities, and defendant "skipped bail and became a fugitive to avoid prosecution.")

"It is no mystery why the government devoted limited resources to locating" defendant Aguilar. *Hernandez*, 2020 WL 2464800, at *7. As the DEA noted in defendant Aguilar's Form 202, "he was not a 'priority target.'" *Id.*; (Gov't. Exh. A-1 at 1.) "The court would have to be blind to reality to not recognize that law enforcement agencies must often make choices, based on limited resources, to investigate some matters less thoroughly than others and search less

/////

/////

/////

/////

1   diligently for some individuals than for others."[25] *Vasquez*, 15 F. Supp. 3d at 1003.  "It is not for

2   the court to fully understand or second-guess those decisions," and the court certainly does not do

3   so here.  *Id.*  However, "when law enforcement decides not to diligently search for a particular

4   defendant, the government may have to bear the responsibility for any prejudice the defendant

5   suffers as a result of that decision."  *Id.*  In this case, the government simply cannot be said to

6   have made a "serious effort" to find defendant Aguilar, and the government "must now bear that

7   responsibility" in this regard.  *Mendoza*, 530 F.3d at 763; *Hernandez*, 2020 WL 2464800, at *7;

8   *see also Schlor*, 2008 WL 4949037, at *4 ("The primary justification for the Government's

9   failure to advise Defendant of the Indictment seems to be its belief that Defendant would not

10  cooperate . . . . it does not appear that anyone analyzed the conflict between the obligation to

11  provide a speedy trial and the desire to arrest Defendant before he had notice of the charges.  The

12  record suggests that nothing of substance was ever done to locate the Defendant."); *Velazquez*,

13  749 F.3d at 177 ("[L]aw enforcement priorities have little role to play in the negligence calculus.

14  If authorities choose to ignore available leads about a suspect's whereabouts in favor of other

15  tasks, they may nonetheless be found negligent within the context of the speedy trial right.").

16          Accordingly, the court finds that consideration of the second *Barker* factor weighs in

17  favor of defendant Aguilar.

18          3.      Whether Defendant Timely Asserted his Right to a Speedy Trial

19          "The third factor evaluates whether the defendant has asserted his right to a speedy trial."

20  *Vasquez*, 15 F. Supp. 3d at 1005.  In weighing this factor, courts consider whether a defendant's

21  "failure to assert that right contributed to the delay."  Hernandez, 2020 WL 2464800, at *8.  A

22  criminal defendant, however, "has no duty to bring himself to trial."  Barker, 507 U.S. at 527.

23  "Accordingly, a defendant's obligation to assert his speedy trial right only arises after he knows

24  that he has been indicted."  Hernandez, 2020 WL 2464800, at *8 (emphasis in original).

---

25  [25]  Indeed, former DEA Special Agent Sicord testified at the June 28, 2022 evidentiary hearing
26  that, particularly in multi-defendant cases, law enforcement must balance the benefits and
27  drawbacks of taking certain investigative efforts, such as surveilling or investigating addresses
    associated with one defendant, because doing so carries the risk of alerting other defendants as to
28  law enforcement's investigation.  (Doc. No. 250 at 94.)

Defendant Aguilar asserts that he had no knowledge of the indictment until his arrest in October 2019.  (Doc. No. 237 at 1.)  The government, without stating so explicitly, suggests that defendant Aguilar must have known about the indictment, because "several of the defendants were related to others in the conspiracy," one defendant "shares the last name as the defendant's wife, Silvia Farias Gonzalez," and a DEA press release and local news article announced the arrest of five of the defendants in connection with the alleged conspiracy in August 2013.  (Doc. No. 9 at 19–20.)

Even assuming the court found the government's argument in this regard to be persuasive, the government could at most establish that defendant knew he was under investigation or was wanted by law enforcement.  However, the Ninth Circuit has drawn a distinction between a defendant's knowledge that he is being investigated or wanted and a defendant's knowledge of a criminal indictment having been issued against him.  *See United States v. Williams*, 782 F.2d 1462, 1465–66 (9th Cir. 1985) ("[A]lthough there was some indication that [defendant] may have known that postal authorities were looking for him, there was no evidence, in fact, that [defendant] knew of the indictment. . . . Thus, the failure to assert his right to a speedy trial will not be weighed against [him]."); *Beamon*, 992 F.2d at 1013 (finding that the third *Barker* factor did not weigh against a defendant who knew he was under investigation, but not did know of the indictment); *see also Hernandez*, 2020 WL 2464800, at *9 ("Even if the government's evidence suggests that [defendant] may have known he was under investigation, the government has presented *no* evidence that he knew about the indictment.") (emphasis in original); *cf. Sandoval*, 990 F.2d at 485 (holding that defendant's speedy trial right was not violated because he was "well aware of the indictment against him [and] skipped bail and became a fugitive to avoid prosecution").

The evidence before the court does not suggest that defendant Aguilar knew about the indictment against him.  As noted above, the evidence establishes that defendant Aguilar lived openly under his true name during the period between his indictment and arrest and, during that time, appears to have engaged in various activities—such as filing taxes, owning property in his true name, interacting with law enforcement in connection with his employment, and

30

1    intermittently providing his contact information to the California DMV and USCIS—without

2    regard for their potential to make him identifiable to law enforcement.  (*See* Doc. No. 233 at 11;

3    Gov't. Exhs. D-1–D-5.)  Indeed, according to a USMS report, defendant Aguilar shared with the

4    arresting Deputy U.S. Marshal that he was "very surprised that he was being arrested on a case

5    from so long ago in his past" and that he had "assumed that . . . he got away with the crimes."

6    (Gov't. Exh. C-6 at 2.)  While this statement may indicate an awareness that his arrest related to

7    his past actions, his expressed surprise at being arrested after living openly for a number of years

8    is a far cry from establishing that defendant Aguilar knew he had been indicted in federal court

9    nearly seven years earlier.

10          Having found no evidence establishing that defendant knew he had been indicted in this

11   case, the court next considers how soon defendant Aguilar asserted his speedy trial right

12   following his arrest.  Defendant first appeared before the court in connection with this case on

13   November 1, 2019.  (Doc. No. 181.)  Since that time, and up until filing the pending motion, he

14   stipulated to a total of seven continuances, and he did not file the pending motion to dismiss his

15   indictment on speedy trial grounds until April 25, 2022, nearly two-and-a-half years after his

16   arrest.  (*See* Doc. Nos. 196, 202, 205, 211, 222, 225, 228, 233.)

17          Defendant Aguilar contends that he has "asserted his right to a speedy trial absent Covid

18   Delays [sic]."  (Doc. No. 233 at 7.)  Although the court acknowledges that the COVID-19

19   pandemic has caused many unfortunate delays in legal proceedings, including in this judicial

20   district, defendant Aguilar has provided no further explanation linking the ongoing pandemic to

21   his over-two-year delay in asserting his speedy trial right following his arrest.  As a result, the

22   court finds that consideration of this factor weighs in favor of neither the defendant nor the

23   government.  *See, e.g.*, *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007)

24   ("Because [defendant] asserted his speedy trial right only after requesting [eight] continuances,

25   we find this factor weighs neither in favor of dismissal nor in favor of the government.");

26   *Mendoza*, 530 F.3d at 764 (finding that third *Barker* factor does not weigh in favor of either the

27   defendant or the government where the defendant did not assert his right to a speedy trial until

28   after he made "numerous requests for continuances and delayed the trial date by over a year."); *cf.*

1  *United States v. Gregory*, 322 F.3d 1157, 1162 n.4 (9th Cir. 2003) ("[W]e have twice concluded

2  that prompt assertion of speedy trial rights weighs, at least slightly, in the defendant's favor.").

3          4.        Whether Defendant Suffered Actual Prejudice

4          The court next turns to the final *Barker* factor, which asks whether the defendant has

5  suffered actual prejudice as a result of the delay.  *Barker*, 407 U.S. at 532.  However, and of great

6  importance here, "no showing of prejudice is required when the delay is great and attributable to

7  the government."  *United States v. Shell*, 974 F.2d 1035, 1036 (9th Cir. 1992) (citing *Doggett*,

8  505 U.S. 647 (1992)).  "[I]f the government is negligent in pursuing the defendant, prejudice

9  [under the fourth *Barker* factor] is presumed."  *Mendoza*, 530 F.3d at 763.  "The presumption of

10  prejudice increases with the length of the delay."  *Shell*, 974 F.2d at 1036.

11          Because the court finds that the government was negligent in pursuing defendant Aguilar

12  and that this negligence was the primary cause of the 77-month delay between the time when he

13  was indicted and when he was eventually arrested, prejudice is presumed, and defendant Aguilar

14  is not required to make a showing of actual prejudice in this case.  *See Shell*, 974 F.2d at 1036

15  ("Five years delay attributable to the government's mishandling of [defendant's] file, like the

16  eight year delay in *Doggett*, creates a strong presumption of prejudice"); *Barragan*, 2015 WL

17  3548532, at *4 (finding that 54-month delay attributable to government created presumption of

18  prejudice); *see also Schlor*, 2008 WL 4949037, at *5 ("A seven year delay requires no

19  presumption to find prejudice.").

20          When the government is negligent in pursuing a defendant, the presumption that a

21  defendant suffered prejudice is "strong."  *Mendoza*, 530 F.3d at 765.  "[I]n order to rebut the

22  presumption of prejudice, the Government has to show that the delay left Defendant's ability to

23  defend himself unimpaired."  *Schlor*, 2008 WL 4949037, at *5 (citing *Doggett*, 505 U.S. at 658

24  n.4).  Under this standard, "the government faces a high, and potentially insurmountable, hurdle

25  in seeking to disprove general prejudice where the period of delay is extraordinarily long."

26  *Velazquez*, 749 F.3d at 185.

27          In addition to asserting that prejudice may be presumed in this case, defendant Aguilar

28  argues that he is at an "extreme disadvantage" due to the passage of time, the deportation of a

1    material witness (Jose Martinez-Gonzalez), and the loss of witnesses who were only identified as

2    "Tio," "LNU," and "FNU."  (Doc. No. 233 at 4, 8.)  In opposition, the government argues that

3    "[w]hile it is true that Jose-Martinez Gonzalez was deported in 2018 by ICE authorities after he

4    served the sentence imposed in this case, there is no evidence of Jose Martinez-Gonzalez's

5    involvement in or knowledge of [defendant Aguilar's alleged] drug transaction with Luis

6    Martinez-Gonzalez."  (Doc. No. 235 at 17.)  The government also asserts that because "Tio" was

7    never positively identified by the DEA and was not charged in this case, defendant Aguilar has

8    not been prejudiced by his inability to locate "Tio" all these years later.  (*Id.*)

9         However, bare assertions that there is no evidence that Jose Martinez-Gonzalez—an

10   alleged co-conspirator—had any knowledge of defendant Aguilar's alleged acts in furtherance of

11   the conspiracy does not establish that defendant Aguilar's ability to defend himself is unimpaired.

12   The court is also unconvinced that because "Tio" was never positively identified, there has not

13   been a loss of any material witnesses as a result of the six-and-a-half-year delay in this case.  If

14   nothing else, the witnesses that defendant could call in his defense have likely had their memories

15   and perceptions blunted by time, and the government makes no effort to counter that likelihood.

16   The government's arguments incorrectly attempt to "turn[] [the government's] burden to disprove

17   general prejudice on its head by suggesting that its rebuttal effort must be found successful unless

18   [defendant] can identify prejudice."  *Velazquez*, 749 F.3d at 185.   Accordingly, the court finds

19   that the government has failed to meet its heavy burden to rebut the presumption of prejudice in

20   this case.

21        On balance, the court finds that consideration of the first, second, and fourth *Barker*

22   factors weigh in favor of defendant Aguilar, while consideration of the third *Barker* factor weighs

23   in favor of neither party.  Ultimately, "[a] defendant has no duty to bring himself to trial; the State

24   has that duty as well as the duty of insuring that the trial is consistent with due process."  *Barker*,

25   407 U.S. at 528.  The court concludes in light of the evidence presented in this case that the

26   almost seven-year delay between defendant Aguilar's indictment and his arrest violated his Sixth

27   Amendment right to a speedy trial.

28   /////

1

**CONCLUSION**

2     For the reasons set forth above:

3     1.     Defendant Aguilar's motion to dismiss the indictment (Doc. No. 233) is granted;

4     2.     The indictment (Doc. No. 1) is dismissed as against defendant Miguel Angel

5          Aguilar Chavez only;

6     3.     The Clerk of the Court is directed to update the docket to reflect that defendant

7          Aguilar has been terminated from this action; and

8     4.     The Clerk of the Court is directed to reassign this case to U.S. District Judge Ana

9          de Alba for all further proceedings before the district court.  The parties are

10         advised that all future filings in this case in this district court shall bear the new

11         case number of 1:13-cr-00218-ADA-BAM.

12 IT IS SO ORDERED.

13     Dated:   __October 3, 2022__           _____

14                                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28